UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GERALD RUGGIERO,

                              Plaintiff,

          -v-                                    5:17-CV-790

CITY OF CORTLAND,
NEW YORK, COUNTY OF
CORTLAND, NEW YORK,
BRIAN TOBIN, individually
and in his official capacity
as Mayor, RICHARD VAN
DONSEL, individually and in
his official capacity as
Corporation Counsel, DAVID
BRIGGS, individually and
in his official capacity as Tax
Assessor, ROBERT RHEA,
individually and in his official
capacity as Zoning Officer,
MACK COOK, individually his
official capacity as Director of
Administration and Finance,
WILLIAM KNICKERBOCKER,
individually his official capacity
as Director of Code Enforcement,
CHARLES GLOVER, individually
his official capacity as Fire Chief,
MARY KAY HICKEY, individually
and in her official capacity as
Chairperson of the Zoning Board
of Appeals Chairperson, JIM
REENERS, individually and in
his official capacity as a member
of the Planning Commission,
TROY BECKWITH, individually
and in his official capacity as
member of the Planning
Commission, KATHRYN
SILLIMAN, individually and in
her official capacity as Alderman,
KEN DYE, individually

and in his official capacity as
Alderman, THOMAS MICHALES,
individually and in his official
capacity as Alderman, JOHN
BENNETT, JR., individually and in
his official capacity as Alderman,
MARK SUBEN, individually and
in his official capacity as Cortland
County District Attorney, F. MICHAEL
CATALANO, individually and in his
official capacity as Chief of Police,
PAUL SANDY, individually and in
his official capacity as Deputy Chief
of Police, BRIAN MYERS,
individually and in his official capacity
as Police Officer, KENNETH BUSH,
individually and in his official capacity
as Investigating Police Officer,
JOHN DOE(S), and JANE DOE(S),

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

GERALD RUGGIERO
Plaintiff, Pro Se
764 Sleepy Hollow Road
Cortland, NY 13045

OFFICE OF FRANK W. MILLER              FRANK W. MILLER, ESQ.
Attorneys for Defendants City of        CHARLES C. SPAGNOLI, ESQ.
    Cortland, New York, Brian Tobin,
    Richard Van Donsel, David Briggs,
    Robert Rhea, Mack Cook, William
    Knickerbocker, Charles Glover,
    Mary Kay Hickey, Jim Reeners,
    Troy Beckwith, Kathryn Silliman,
    Ken Dye, Thomas Michales, John
    Bennett, Jr., Mark Suben, F. Michael
    Catalano, Paul Sandy, Brian Myers,
    and Kenneth Bush
6575 Kirkville Road
East Syracuse, NY 13057

BARTH, SULLIVAN LAW FIRM    DAVID H. WALSH, IV, ESQ.
Attorneys for Defendant County
 of Cortland, New York
224 Harrison Street
Syracuse, NY 13202

CORTLAND COUNTY     KAREN L. HOWE, ESQ.
 ATTORNEY'S OFFICE
Attorneys for Defendant County
 of Cortland, New York
60 Central Avenue, Suite 312
Cortland, NY 13045

DAVID N. HURD
United States District Judge

## **MEMORANDUM–DECISION and ORDER**

## I. **INTRODUCTION**

On July 19, 2017, pro se plaintiff Gerald Ruggiero ("Ruggiero" or "plaintiff") initiated

this civil rights action against defendants County of Cortland, New York (the "County"),

Cortland County District Attorney Mark Suben ("District Attorney Suben"), the City of

Cortland, New York (the "City"), Mayor Brian Tobin ("Mayor Tobin" or "Tobin"), Corporation

Counsel Richard Van Donsel ("Attorney Van Donsel"), Tax Assessor David Briggs ("Tax

Assessor Briggs"), Zoning Officer Robert Rhea ("Zoning Officer Rhea"), Director of

Administration and Finance Mack Cook ("Director Cook"), Director of Code Enforcement

William Knickerbocker ("Director Knickerbocker"), Fire Chief Charles Glover ("Fire Chief

Glover" or "Glover"), Zoning Board of Appeals Chairperson Mary Kay Hickey ("Chairperson

Hickey"), Planning Commission Member Jim Reeners ("Commission Member Reeners"),

Planning Commission Member Troy Beckwith ("Commission Member Beckwith"), Alderman

Kathryn Silliman ("Alderman Silliman"), Alderman Ken Dye ("Alderman Dye"), Alderman

Thomas Michales ("Alderman Michales"), Alderman John Bennett, Jr. ("Alderman Bennett"),

Chief of Police F. Michael Catalano ("Police Chief Catalano"), Deputy Chief of Police Paul Sandy ("Deputy Chief Sandy"), Police Officer Brian Myers ("Officer Myers"), Police Officer Kenneth Bush ("Officer Bush"), and John and Jane Does (collectively the "Does").

Ruggiero's operative complaint[1] sets forth eight causes of action pursuant to 42 U.S.C. §§ 1983 and 1985 as well as the New York State Constitution. The County and District Attorney Suben (collectively the "County defendants") have moved under Federal Rule of Civil Procedure ("Rule") 12(c) for a judgment on the pleadings dismissing plaintiff's operative complaint insofar as it asserts one or more claims against them. The City, Mayor Tobin, Attorney Van Donsel, Tax Assessor Briggs, Zoning Officer Rhea, Director Cook, Director Knickerbocker, Fire Chief Glover, Chairperson Hickey, Commission Member Reeners, Commission Member Beckwith, Alderman Silliman, Alderman Dye, Alderman Michales, Alderman Bennett, Police Chief Catalano, Deputy Chief Sandy, Officer Myers, and Officer Bush (collectively the "City defendants") have also filed a Rule 12(c) motion requesting complete dismissal of the various claims asserted against them.

Ruggiero opposes both motions, which have been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. **BACKGROUND**[2]

Since the early 1990s, Ruggiero has invested in rental properties in and around the City. Am. Compl. ¶ 34. In 2009, the City passed Rental Housing Law § 102 ("Section 102"). Id. ¶ 41. According to plaintiff, Section 102 was intended to "provide the City with

---

[1] Plaintiff amended his complaint on August 29, 2017. Dkt. No. 32.

[2] The following factual allegations are assumed true for purposes of resolving defendants' motions to dismiss.

better information and tools to enforce laws limiting the number of unrelated persons per dwelling unit, and [to] stop[ ] the excess paving of green space to accommodate the excess tenants." Id. Plaintiff alleges that Tobin, then a City alderman, "conspired to steer the direction of the development of the rental permit law [Section 102] for the economic benefit of [Chris] Calabro against the legislative intent of the local zoning ordinances" and the City's comprehensive zoning plan. Id. ¶ 42. As plaintiff explains, Chris Calabro ("Calabro") was, and remains at all times relevant here, Mayor Tobin's "friend and political donor." Id. ¶ 39.

On July 19, 2011, former City Corporation Counsel Patrick Perfetti ("Attorney Perfetti") wrote an e-mail admonishing then-mayoral candidate Tobin for arguing "that some citizens should get special treatment." Am. Compl. ¶ 38. According to Ruggiero, Tobin's argument explicitly "condone[d] the breaking of City laws by some landlords." Id.

On August 15, 2011, then-candidate Tobin, in apparent disregard of Attorney Perfetti's advice, e-mailed the City's aldermen stating "Chris Calabro was not breaking the laws and therefore was entitled to special treatment." Am. Compl. ¶ 39. Candidate Tobin's e-mail further indicated "he was proud to have the financial support of his friend and donor and would stand by and support him." Id.

On August 12, 2011, Glover, then the Director of Code Enforcement, "admitted that the City of Cortland selectively enforces the zoning laws through the use of improperly issued [zoning permits], specifically to Calabro." Am. Compl. ¶ 40. At that time, Glover placed the blame for this practice "on the lawyers and politicians." Id. According to plaintiff's complaint, Glover's statements were captured "in a tape recorded and transcribed conversation." Id.

On January 1, 2012, Tobin became Mayor. Am. Compl. ¶ 43. According to the amended complaint, Mayor Tobin's administration has "intentionally enforced the zoning and

code enforcement laws differently for his donor [Calabro] and for others connected to the City.  Id.

At some point, Ruggiero "was placed on the agenda" of the November 18, 2013 Zoning Board of Appeals ("ZBA") meeting to "discuss fraudulently issued [zoning permits] by the City."  Am. Compl. ¶ 45.  However, plaintiff alleges Attorney Van Donsel conspired with Chairperson Hickey to remove plaintiff from the proceeding.  Id. ¶ 46.  According to the amended complaint, Attorney Van Donsel asked Chairperson Hickey "to not communicate the reasons for the removal to the other ZBA members or to allow any discussion."  Id.

On March 7, 2014, during an Article 78 proceeding brought by Ruggiero, Attorney Van Donsel "intentionally and with malice misrepresented the zoning ordinances and case law in an effort to mislead the Chenango County State Supreme Court."  Am. Compl. ¶ 47.

Thereafter, Ruggiero requested to meet with the City's "Ethics Board" to "discuss the corruption and the selective enforcement of the zoning laws and illegal tax assessments in the City" as well as the "unlawful and discriminatory acts by the Defendants."  Am. Compl. ¶ 48.  Plaintiff alleges Mayor Tobin's administration "never set up" the Ethics Board, which is itself a "violation of the City Charter."  Id.  Plaintiff further alleges the issue was "hurriedly" placed on the Common Council's May 20, 2014 agenda.  Id.

On May 20, 2014, the Common Council appointed Attorney Van Donsel as well as former alderman Clay Benedict ("Benedict") to the ethics committee to fill two of the three vacant positions.  Am. Compl. ¶ 49.  Four days later, plaintiff e-mailed Mayor Tobin requesting a meeting with the Ethics Board, the aldermen, and/or Mayor Tobin "to discuss the selective enforcement of the zoning laws."  Id. ¶ 50.  Mayor Tobin responded by advising plaintiff to "share whatever documentation you have with the City Corporation Counsel so he

can make a determination about its validity and the appropriate actions, if needed."  Id.  According to the amended complaint, "filter[ing]" complaints through Attorney Van Donsel violated the City Charter and plaintiff's constitutional rights.  Id.

On May 27, 2014, Calabro received approval from the City Planning Commission "to add a drywell to the backyard and raise a rear roof on his property at 89 Tompkins Street."  Am. Compl. ¶ 52.  According to the amended complaint, the Planning Commission's approval "ignored the necessity of variances in violation of their duty in §300-135(B)(1)."  The complaint further alleges that this work and other, related improvements made by Calabro at the Tompkins Street property were performed "all without necessary permits and variances."  Id.

On November 12, 2014, at 12:00 p.m., Zoning Officer Rhea told Ruggiero "that the zoning laws are not enforced equally, and [p]laintiff is a fool if he thinks they should be."  Am. Compl. ¶ 53.  According to plaintiff's complaint, Zoning Officer Rhea then "made the decision that a variance was not required for [Calabro's Tompkins Street] property."  Id. ¶ 54.  Plaintiff appealed the decision to the ZBA, which put the matter on the December 8, 2014 agenda.  Id. ¶ 55.

Thereafter, in an e-mail sent on December 3, 2014, Zoning Officer Rhea, Attorney Van Donsel, Director Cook, and Chairperson Hickey "unsuccessfully conspired in ex parte communication to rule against" Ruggiero.  Am. Compl. ¶ 55.  Plaintiff further alleges that Attorney Van Donsel "attempted to remove" plaintiff from the proceeding in a communication with Chairperson Hickey.  Id. ¶ 56.

On December 8, 2014, Ruggiero presented his case at the ZBA hearing.  Am. Compl. ¶ 57.  The ZBA then "closed the hearing for deliberations, requested documents from

both sides, and tabled the appeal until the January 12, 2015 meeting." Id.

On December 24, 2014, pursuant to a request made by the ZBA at the last meeting, Ruggiero submitted to the aldermen, the ZBA members, and City officials "substantial evidence proving discriminatory enforcement of the zoning laws for political reasons."  Am. Compl. ¶ 58.  After reviewing the evidence, the aldermen "recommended an independent committee to review the evidence" at the upcoming meeting of the Common Council.  Id. The complaint alleges the aldermen never formed any such committee.  Id. ¶ 59.

On December 29, 2014, Zoning Officer Rhea conspired with Attorney Van Donsel to remove Ruggiero from the ZBA's January 12, 2015 agenda.  Am. Compl. ¶ 60.  After Zoning Officer Rhea told plaintiff he had been removed from the agenda, plaintiff "immediately appealed and the matter was placed back on the agenda."  Id

On January 12, 2015, between 9:05 a.m. and 9:26 a.m., Attorney Van Donsel and Chairperson Hickey exchanged a series of e-mails in which they conspired to remove Ruggiero from the ZBA's agenda.  Am. Compl. ¶ 61.  According to the amended complaint, the pair planned to use police to remove plaintiff.  Id.  During the meeting, ZBA member David Funk ("ZBA Member Funk") refused Attorney Van Donsel's request to dismiss plaintiff's case for running afoul of the relevant statute of limitations.  Id. ¶ 62.  The ZBA again tabled their deliberations and asked for more information from the City.  Id.

On or about January 19, 2015, Alderman Linda Ferguson ("Alderman Ferguson") contacted Ruggiero to tell him that "City officials were manufacturing a harassment case to silence him regarding the selective enforcement of the zoning laws."  Am. Compl. ¶ 63. Among other things, Alderman Ferguson told plaintiff "she was aware of evidence that contradicted this manufactured case."  Id.

On January 20, 2015, Ruggiero met with Police Chief Catalano "to discuss the corruption in the City" and the "manufacturing of a false harassment charge." Am. Compl. ¶ 64. The amended complaint alleges that Director Cook, "in a tape recorded conversation," agreed with plaintiff about the "discriminatory enforcement of the zoning and code enforcement laws and illegal tax assessments." Id. ¶ 65. Plaintiff e-mailed the aldermen to alert them to these recorded admissions. Id.

On February 9, 2015, the ZBA "made clear" that "no evidence exists" to establish that Calabro's Tompkins Street project did *not* need a variance. Am. Compl. ¶ 66. At this meeting, ZBA Member Christine Place ("ZBA Member Place") "admitted on the record" that ZBA members were aware of selective enforcement of the zoning regulations by unnamed City officials. Id. ¶ 67. ZBA Member Place also "admitted awareness" of "unequal tax assessments favoring connected landlords." Id.

On March 2, 2015, "in a taped and transcribed conversation," Zoning Officer Rhea told Ruggiero the City was "creating a Certificate of Compliance to take care of the defects in the statute of limitations argument that were adjudicated at the last ZBA meeting." Am. Compl. ¶ 68.

On March 4, 2015, Zoning Officer Rhea told Ruggiero that "the grandfather date for occupancy restrictions can be different for each landlord, agreed that Calabro needed a variance, and that the City can enforce zoning laws different against landlords in similar situations." Am. Compl. ¶ 69. Plaintiff documented this discussion in an e-mail. Id.

On March 9, 2015, at a fourth ZBA meeting, ZBA Member Place "produced a Certificate of Compliance that was "allegedly *found* on that day" by the property owner Calabro." Am. Compl. ¶ 71 (emphasis in original). However, ZBA Member Funk expressed

on the record his belief that the document was not real because Calabro had "told him a few months earlier that he was never given a Certificate of Compliance." Id.

On April 4, 2015, Alderman Dye conspired with other unnamed defendants to retaliate against Ruggiero by e-mailing District Attorney Suben to request that plaintiff be prosecuted for harassment. Am. Compl. ¶ 70. The amended complaint alleges that Alderman Dye's e-mail suggested District Attorney Suben was "an outside source" that "would shield the involvement of the City Defendants." Id.

On April 7, 2015, at a "videotaped public meeting held in City Hall," Mayor Tobin and Zoning Officer Rhea violated Ruggiero's "personal space" in front of approximately fifty people. Am. Compl. ¶ 76.

On April 28, 2015, Chairperson Hickey e-mailed Attorney Van Donsel describing a "conspiracy"—how Calabro "reneged on a side agreement to remove excess parking at 89 Tompkins Street for the agreement to end [Ruggiero's] appeal." Am. Compl. ¶ 77. The amended complaint alleges that Chairperson Hickey's e-mail indicated the City's actions proved that it selectively enforced the zoning laws and that "several ZBA members would be angry enough to quit." Id.

On June 12, 2015, Ruggiero called Zoning Officer Rhea to discuss a new zoning violation at Calabro's Tompkins Street property. Am. Compl. ¶ 78. In response, Zoning Officer Rhea requested an in-person meeting with plaintiff. Id. A few minutes into this meeting, plaintiff "confronted" Zoning Officer Rhea with the "taped conversations" he had recorded of their previous interactions. Id. According to plaintiff, Zoning Officer Rhea started a "physical confrontation." Id. Plaintiff left the meeting and reported the incident to Attorney Van Donsel and other City officials. Id.

On July 9, 2015, Ruggiero was diagnosed with shingles and put on "several strong medications." Am. Compl. ¶ 79. Two days later, on plaintiff's twenty-third wedding anniversary, Officer Myers arrested plaintiff for second degree harassment based on the earlier June 12 confrontation with Zoning Officer Rhea. Id. ¶ 80. Officer Myers placed plaintiff in the back of a City police car. Id. ¶ 81.

Ruggiero, an asthmatic, could not breathe for the "roughly 5 minute car ride" and asked Officer Myers for assistance, which was denied. Am. Compl. ¶ 81. Unknown police officers also denied plaintiff access to his pain medication until "several hours later." Id. After the arraignment, plaintiff's wife told him that "the arrest was the final straw" and that "she wanted a divorce." Id. ¶ 82. Plaintiff alleges Director Cook, Mayor Tobin, Deputy Chief Sandy, and Attorney Van Donsel conspired to have him arrested. Id. ¶¶ 83-91.

On August 10, 2015, District Attorney Suben offered to dismiss the criminal charge against Ruggiero if he would agree not to sue for false arrest and malicious prosecution. Am. Compl. ¶ 92. Plaintiff declined. Id. Thereafter, District Attorney Suben told plaintiff he knew that City officials selectively enforced the zoning laws. Id. ¶¶ 93-96.

On May 16, 2016, Assistant District Attorney ("ADA") Robert DeMarco reviewed Ruggiero's case and agreed to dismiss the charges. Am. Compl. ¶¶ 99-101. At unspecified points in 2015 and 2016, City officials, including Zoning Officer Rhea and Director Knickerbocker, continued to unfairly enforce the zoning laws against plaintiff. Id. ¶¶ 102-107.

Ruggiero further alleges that Tax Assessor Briggs is Calabro's neighbor and "consistently assess[es] his properties substantially lower than fair market value" even though plaintiff has "been given assessments of 125% of purchase price without any rational basis." Am. Compl. ¶ 110.

## III. **LEGAL STANDARDS**

### A. **Judgment on the Pleadings**

"The standard for granting a [Rule 12(c)] motion . . . is 'identical' to that of a 12(b)(6) motion to dismiss." N.Y. by Schneiderman v. Utica City Sch. Dist., 177 F. Supp. 3d 739, 746 (N.D.N.Y. 2016) (quoting Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012)).

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Ginsburg, 839 F. Supp. 2d at 540 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Although a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief' (FED. R. CIV. P. 8(A)(2)), more than mere conclusions are required." Id.

"Indeed, '[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.'" Ginsburg, 839 F. Supp. 2d at 540 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims." Id.; see also Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face").

"When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.). In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be

taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

However, in some cases, "a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." Goel, 820 F.3d at 559. Importantly, though, a document is only "integral" to the complaint "where it relies heavily upon its terms and effect." Id. (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

In other words, mere notice or possession of the document is not enough; rather, the plaintiff must have relied on the terms and effect of the document in drafting the complaint. See Goel, 820 F.3d at 559; see also Nicosia v. Amazon.com, Inc., 834 F.3d 220, 231 (2d Cir. 2016) (observing that this exception is typically invoked where the unincorporated material is a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint").

**B. 42 U.S.C. § 1983**

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). However, "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993). Thus, a § 1983 claim requires a plaintiff to show (1) the deprivation of a right, privilege, or immunity secured by the Constitution and its laws by (2) a person acting under the color of state

law.  42 U.S.C. § 1983.

### C.  Municipal Liability Under § 1983

"Before a municipality can be held liable under § 1983, it must be shown to have been 'the moving force of the constitutional violation.'" Carmichael v. City of N.Y., 34 F. Supp. 3d 252, 262-63 (E.D.N.Y. 2014) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)); see also Cash v. Cty. of Erie, 654 F.3d 324, 341-42 (2d Cir. 2011) (equating "moving force" with "proximate cause").

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove:  (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted).

"The fifth element reflects the notion that 'a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.'" Cowan v. City of Mt. Vernon, 95 F. Supp. 3d 624, 643 (S.D.N.Y. 2015) (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997)).  Importantly, this element "can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort.'" Roe, 542 F.3d at 36 (citation omitted).  However, a "municipal policy may be pronounced or tacit and reflected in either action or inaction." Cash, 654 F.3d at 334; see also Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) ("The policy or custom need not be memorialized in a specific rule or regulation.").

### D.  Supervisory Liability Under § 1983

Section 1983 does not provide for the kind of *respondeat superior* tort liability

commonly pursued in other contexts.  See, e.g., Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 901, 806 (S.D.N.Y. 2011) ("Supervisory liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior.").

"The personal involvement of a supervisory defendant may be shown by evidence that:  (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring."  Odom v. Matteo, 772 F. Supp. 2d 377, 403 (D. Conn. 2011) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); see also Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014) (noting that the continued vitality of all five Colon factors remains an open question post-Iqbal).

### E. 42 U.S.C. § 1985

"42 U.S.C. § 1985 was enacted as part of the Civil Rights Act of 1861, 'which is commonly referred to as the Ku Klux Klan Act.'" Empire Merchants, LLC v. Reliable Churchill LLP, 2017 WL 7512900, at *8 (E.D.N.Y. Jan. 30, 2017) (quoting Keating v. Carey, 706 F.3d 377, 389 (2d Cir. 1983)).  "One of the protections provided by the statute to '[t]hose harassed and threatened by rampant vigilantism, notably blacks and black supporters in the South . . . , [was] a remedy to vindicate their civil rights' by assuring that those '[g]roups threatened by the wave of racial/political violence . . . [had] access to the courts.'" Id.  "To that end, the Act 'proscribed conspiracies that interfere with . . . the administration of justice

- 15 -

in federal courts.'" Id. (quoting Kush v. Rutledge, 460 U.S. 719, 724 (1983)).

## IV. **DISCUSSION**

At the outset, a few things bear mention.  First, even though it is not at all apparent from the logically organized and clearly written nature of his submissions, Ruggiero is proceeding without the benefit of a lawyer, a state of affairs that entitles him to a certain measure of latitude here.

As the Second Circuit has repeatedly explained, "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Ahlers v. Rabinowitz, 684 F.3d 53, 60 (2d Cir. 2012) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)).  "This is particularly so when the *pro se* plaintiff alleges that h[is] civil rights have been violated." Id. (quoting Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008)). [3]

Second, and relatedly, Ruggiero has included in his opposition memoranda certain additional factual allegations that attempt to explain in greater detail the overall narrative thread running through his amended complaint.  Pl.'s City Opp'n, Dkt. No. 55-2 at 3-6; Pl.'s County Opp'n, Dkt. No. 55-3 at 3-7. [4]

Although in reply both sets of defendants urge the Court to ignore these additional facts, they will be considered here as providing useful context for determining Ruggiero's claims in light of the pending motions.  See, e.g., Boguslavsky v. Kaplan, 159 F.3d 715, 719

---

[3]  However, "all normal rules of pleading are not absolutely suspended" when a plaintiff is proceeding pro se. Jackson v. Onondaga Cty., 549 F. Supp. 2d 204, 214 (N.D.N.Y. 2008) (McAvoy, J.) (internal quotation marks and footnote omitted).  Even a pro se plaintiff must plead sufficient factual allegations to suggest an entitlement to relief.  See id.  Simply put, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citations omitted).

[4]  Pagination corresponds with CM/ECF.

(2d Cir. 1998) ("[C]ourts may look to submissions beyond the complaint to determine what claims are presented by an uncounseled party.").

Third, Ruggiero's amended complaint recounts incidents that occurred as far back in time as late 2009 and even beyond. However, "[f]or a § 1983 claim arising in New York, the statute of limitations is three years." <u>Fierro v. N.Y.C. Dep't of Educ.</u>, 994 F. Supp. 2d 581, 85-86 (citations omitted). Plaintiff filed his initial civil rights complaint in this action on July 19, 2017. Accordingly, the applicable statute of limitations bars consideration of the incidents that occurred before July 19, 2014.[5]

Fourth and finally, in order to be held liable for one or more of Ruggiero's civil rights claims, each defendant must have been *personally involved* in each alleged constitutional violation. <u>See, e.g.</u>, <u>Odom</u>, 772 F. Supp. 2d at 403 ("It is well-settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

Although Ruggiero's operative pleading and his opposition submissions are well-formatted and well-organized, at certain points he resorts to attributing misconduct to "defendants" in conclusory or generalized terms. However, because he is pro se, reasonable attempts will be made to connect the alleged misconduct at issue to the particular defendant or defendants responsible.

## A. Conspiracy Claims

With those matters settled, analysis begins with the conspiracy claims because they

---

[5] "A motion to dismiss is often not the appropriate stage to raise affirmative defenses like the statute of limitations." <u>Ortiz v. City of New York</u>, 755 F. Supp. 2d 399, 401 (E.D.N.Y. 2010). However, "as long as the affirmative defense is based on the facts alleged in the complaint, it may be raised on a motion to dismiss." <u>Id.</u> Accordingly, a 12(b)(6) dismissal for untimeliness is warranted where the "complaint shows clearly that a claim is not timely." <u>Id.</u> (citation omitted).

touch on conduct attributed to both sets of defendants. As Ruggiero explains, he alleges three different § 1985(3) conspiracies: a conspiracy to falsely arrest him; a conspiracy to retaliate against him for the exercise of his First Amendment rights; and a conspiracy to deny him his Fourteenth Amendment rights of due process and equal protection. Pl.'s City Opp'n at 9. Plaintiff indicates that he also alleges a conspiracy under § 1985(2), a portion of the civil rights statute designed to protect the rights of parties and witnesses to federal proceedings. Id.

"To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999) (citations omitted).

"A conspiracy 'need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct.'" Thomas, 165 F.3d at 146 (quoting Mian v. Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993)). Importantly, however, a "plaintiff must allege each of these elements with 'at least some degree of particularity.'" Anghel v. N.Y. State Dep't of Health, 947 F. Supp. 2d 284, 303 (E.D.N.Y. 2013) (quoting Powell v. Workmen's Comp. Bd., 327 F.2d 131, 137 (2d Cir. 1964)).

Finally, "[a]lthough no allegation of state action is needed to state a claim under 42 U.S.C. § 1985, the complaint must allege that the plaintiff is a member of a protected class or that he was injured as a result of racial or other class-based" discrimination. Anghel, 947 F.

Supp. 2d at 303; see also Thomas, 165 F.3d at 146 ("Furthermore, the conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.").

Ruggiero argues that City officials enforce the zoning laws in a way that favors "connected landlords," Pl.'s City Opp'n at 11, and contends that Alderman Dye called for the "involvement" of District Attorney Suben when plaintiff challenged these practices, Pl.'s County Opp'n at 13.

But even assuming Ruggiero has satisfied the other elements of a § 1985 conspiracy, he has failed to plausibly allege that any of this conspiratorial misconduct stems from the kind of "racial or other class-based" animus required by controlling federal law. See, e.g., Pravda v. City of Albany, N.Y., 956 F. Supp. 174, 180 (N.D.N.Y. 1997) (Scullin, J.) ("It is well settled that a plaintiff attempting to establish a claim under 42 U.S.C. § 1985(2), clause 2, or § 1985(3) must demonstrate that the Defendant under consideration acted with class-based invidiously discriminatory animus.").[6] Accordingly, plaintiff's various conspiracy claims must be dismissed.

Thus, the following individual claims remain for consideration: (1) a § 1983 claim for false arrest (2) a § 1983 claim for malicious prosecution; (3) a § 1983 claim for denial of medical treatment; (4) a § 1983 claim for retaliation based on protected speech; (5) a § 1983 claim for selective enforcement; (6) a § 1983 claim for municipal liability based on the City's failure to train or supervise its agents in proper zoning practices; and (7) a claim for violation

---

[6] Ruggiero's § 1985(2) claim also fails, since he was neither a party nor a witness to a pending matter in federal court at the time he brought this civil rights action. See, e.g., Empire Merchants, LLC, 2017 WL 7512900, at *11.

of rights secured by the state constitution.[7]

## B. County Defendants

The County defendants assert that only the first and second causes of action in Ruggiero's amended complaint (that is, the § 1983 claims for false arrest and malicious prosecution) are directed at the County and District Attorney Suben. According to these defendants, those causes of action must be dismissed because of various immunity principles and a failure by plaintiff to plead certain necessary elements of those claims.

In opposition, Ruggiero concedes that not all of his causes of action apply to the County defendants. Pl.'s County Opp'n at 7. As plaintiff explains, the third cause of action (alleging a denial of medical treatment) does not apply to the County defendants at all. Id. Plaintiff also agrees that the sixth and seventh causes of action (based on selective or improper zoning) are directed at the City and its various officials, not the two County defendants sued in this action. Id. However, plaintiff insists that District Attorney Suben can be liable for the "equal protect[ion]" causes of action because his actions were part of a "continuing violation." Id

In reply, the County defendants point out that Ruggiero has failed, in both his amended complaint and in his additional opposition submissions, to muster facts sufficient to plausibly support any argument that these additional claims should be considered against them. Defs.' Reply, Dkt. No. 56, 6.

---

[7] There is some confusion about how plaintiff's causes of action actually line up with legally cognizable theories of relief. For instance, the section of plaintiff's complaint entitled "first and second cause of action" actually involves three legally distinct kinds of claims: a § 1985 conspiracy claim, a § 1983 false arrest claim, and a § 1983 malicious prosecution claim. Am. Compl. ¶¶ 112-14. Although this decision makes every attempt to analyze the viability of plaintiff's claims using the parties' preferred nomenclature, appropriate clarification has been made where necessary.

Upon review, the County defendants are correct about this threshold dispute. Ruggiero's amended complaint and the additional factual allegations included in his opposition submission recount a series of interactions with District Attorney Suben, ADA DeMarco, and ADA Wojnowicz arising from his arrest by Officer Myers for second degree harassment after the June 12 confrontation with Zoning Officer Rhea.

Ruggiero's interactions with these prosecutors are best understood to be attempts to plead false arrest and malicious prosecution claims rather than any equal protection-based theory of relief, especially since plaintiff has explicitly admitted that he is not pursuing any discriminatory zoning theory against these particular defendants.[8] Accordingly, only the viability of the § 1983 false arrest and § 1983 malicious prosecution claims will be considered against these defendants. Turning to those claims, the County defendants argue District Attorney Suben enjoys absolute immunity for actions taken in his capacity as an advocate for the state.

"Prosecutors are generally immune from liability under 42 U.S.C. § 1983 for conduct in furtherance of prosecutorial functions that are intimately associated with initiating or presenting the State's case." Flagler v. Trainor, 663 F.3d 543, 546 (2d Cir. 2011). This immunity "protects the proper functioning of the prosecutor's office by insulating the exercise of prosecutorial discretion." Id. Notably, "[p]rosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." Opuku v. Cty. of Suffolk, 123 F. Supp. 3d 404, 416

---

[8] In fact, plaintiff's reference to a "continuing violation" sounds like a good-faith mistake: that language frequently crops up in the context of Title VII & § 1983 claims based on discrimination, but is ordinarily inapplicable to the kind of constitutional claims alleged here. See, e.g., Gonzalez v. Hasty, 802 F.3d 212, 219-22 (2d Cir. 2015) (discussing the origins of the "continuing violation" doctrine and explaining how it can apply to certain § 1983 claims).

(E.D.N.Y. 2015) (internal quotation marks and citation omitted).

However, "[p]rosecutors are absolutely immune from suit only when acting as advocates and when their conduct involves the exercise of discretion." Flagler, 663 F.3d at 547. "Thus, the Supreme Court has found prosecutors absolutely immune from suit for alleged misconduct during a probable cause hearing, initiating a prosecution, and in presenting the State's case." Id. (footnotes omitted). "On the other hand, the Court has withheld absolutely immunity for conduct unrelated to advocacy, such as giving legal advice, holding a press conference, or acting as a complaining witness." Id.

Importantly, the Second Circuit has emphasized that a prosecutor can enjoy this kind of absolute immunity even when the so-called "duties" at issue include such things as false statements made during judicial proceedings, the knowing use of false testimony, deliberately withholding exculpatory evidence, engaging in malicious prosecution, or even attempting to intimidate an individual into accepting a guilty plea. D'Alessandro v. City of N.Y., 713 F. App'x 1, 5 (2d Cir. 2017) (summary order).

Ruggiero alleges he first contacted District Attorney Suben at the end of December 2014 seeking to "start a white-collar proceeding" against several City officials. Pl.'s County Opp'n at 3. Although District Attorney Suben promised plaintiff that a "new lawyer that specializes in white collar crime" would contact him in a few weeks, "[t]hat call never occurred. Id.

Next, in January of 2015, Ruggiero alleges Alderman Ferguson alerted him to the fact that "City officials were manufacturing a harassment case to silence him regarding the selective enforcement of the zoning laws." Am. Compl. ¶ 63; Pl.'s Opp'n at 3. Plaintiff alleges that in March or April Alderman Dye conspired with other unnamed City defendants

to retaliate against plaintiff by e-mailing District Attorney Suben to request that plaintiff be prosecuted for harassment.  Am. Compl. ¶ 70; Pl.'s Opp'n at 3.

Then, on June 12, 2015, Ruggiero called Zoning Officer Rhea to discuss a new zoning violation at Calabro's Tompkins Street property.  Am. Compl. ¶ 78.  In response, Zoning Officer Rhea requested an in-person meeting with plaintiff.  <u>Id</u>.  A few minutes into this meeting, plaintiff "confronted" Zoning Officer Rhea with the "taped conversations" he had recorded of their previous interactions.  <u>Id</u>.  According to plaintiff, Zoning Officer Rhea started a "physical confrontation."  <u>Id</u>.  Plaintiff left the meeting and reported the incident to Attorney Van Donsel and other City officials.  <u>Id</u>.

This incident ultimately resulted in the harassment charge.  In particular, on July 11 Officer Myers arrested Ruggiero for second degree harassment.  Am. Compl. ¶¶ 79-81.  Plaintiff alleges Director Cook, Mayor Tobin, Deputy Chief Sandy, and Attorney Van Donsel conspired to have him arrested on this charge.  <u>Id</u>. ¶¶ 83-91.

On August 7, 2015, Ruggiero went before "Judge Burns," who asked him whether he had discussed plea arrangements with the prosecutor.  Pl.'s County Opp'n at 4.  At that time, plaintiff stated he was absolutely innocent and would accept nothing short of an "absolute dismissal with an apology."  <u>Id</u>.  Plaintiff alleges that ADA Wojnowicz could not find plaintiff's file and ultimately declined his "only plea offer."  <u>Id</u>.  Plaintiff alleges that ADA Wojnowicz and District Attorney Suben then telephoned plaintiff to discuss his case.  <u>Id</u>.  According to plaintiff, these prosecutors told plaintiff that although they could not dismiss the case, they would offer him an "ACD," presumably a short-hand reference to an "adjournment in contemplation of dismissal."  <u>Id</u>.

At that time, Ruggiero alleges he told District Attorney Suben that he believed the

prosecutor had conspired with Alderman Dye to have plaintiff arrested. Pl.'s County Opp'n at 4. According to plaintiff, District Attorney Suben "immediately changed his mind about an outright dismissal" and instead offered to dismiss the charges in exchange for a release of liability. Id. Plaintiff asked for the weekend to think it over. Id.

On August 10, 2015, Ruggiero made a counteroffer that included a liability release for only the County defendants. Pl.'s County Opp'n at 4-5. District Attorney Suben declined. Am. Compl. ¶ 92. Thereafter, plaintiff met with District Attorney Suben to "share convincing evidence" that he was innocent. Pl.'s Opp'n at 5. Plaintiff alleges that District Attorney Suben agreed and "offered the dismissal/release again." Id.

On May 13, 2016, Ruggiero told newly assigned ADA DeMarco that certain favorable case law existed. Pl.'s Opp'n at 5. After reviewing the case, ADA DeMarco agreed to dismiss the charges. Id.; Am. Compl. ¶¶ 99-101.

As this recitation of events makes clear, none of Ruggiero's allegations, whether considered singly or in combination with one another, place District Attorney Suben's conduct outside the relatively broad scope of his absolute prosecutorial immunity. To the contrary, the facts alleged by plaintiff involve (mis)conduct related to the initiation, investigation, presentation, and eventual resolution of the criminal charges against him.

To the extent Ruggiero suggests District Attorney Suben acted outside the scope of this immunity by "working together" with City officials to have him arrested, at best plaintiff has alleged facts showing that City officials turned over to District Attorney Suben evidence of what they perceived to be (whether in good faith or not) plaintiff's unlawful or unfair mistreatment of City officials. Byrne v. City of N.Y., 736 F. App'x 263, 265 (2d Cir. 2018) (summary order) ("The decision whether to bring charges—and even the decision to bring

charges in the absence of adequate evidence—falls squarely within a prosecutor's role as advocate and, therefore, is protected by absolute immunity.").  The same is true of plaintiff's exchanges with ADA DeMarco, which appear to revolve around whether and how the charges against plaintiff could be resolved.

In sum, the facts alleged by Ruggiero fail to place District Attorney Suben's conduct outside the scope of prosecutorial immunity and therefore plaintiff's claims against him must be dismissed.  See, e.g., Pinaud v. Cty. of Suffolk, 52 F.3d 1139, 1147 (2d Cir. 1995) (applying doctrine even though plaintiff "plausibly allege[d] disgraceful behavior by district attorneys").

And without an underlying constitutional violation, there can be no § 1983 liability against the County itself.  See, e.g., Segal v. City of N.Y., 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct.").  Accordingly, the County defendants' motion for judgment on the pleadings must be granted and all claims against those defendants must be dismissed.

## C. City Defendants

Ruggiero asserts the following claims against the City defendants:  (1) a § 1983 claim for false arrest (2) a § 1983 claim for malicious prosecution; (3) a § 1983 claim for denial of medical treatment; (4) a § 1983 claim for retaliation based on protected speech; (5) a § 1983 claim for selective enforcement of the zoning laws; (6) a § 1983 municipal liability claim based on the City's failure to train its enforcement officials in proper zoning practices; and (7) a claim for violation of rights secured by the state constitution.

## 1. **False Arrest**

The City defendants contend the § 1983 false arrest claim must be dismissed because Ruggiero was arrested pursuant to a lawful warrant issued by the Honorable Elizabeth Burns.[9]  Plaintiff responds that the arresting officer failed to conduct any investigation into Zoning Officer Rhea's story before pursuing plaintiff's arrest.

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." Simpson v. Town of Warwick Police Dep't, 159 F. Supp. 3d 419, 434 (S.D.N.Y. 2016) (citation omitted).

"Under New York law, an action for false arrest requires the plaintiff to show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017) (citation omitted).

Ruggiero's false arrest claim must be dismissed.  Plaintiff alleges Zoning Officer Rhea lied to or misled the police about plaintiff's conduct during the June 12 encounter and, as a result, Officer Myers arrested him on July 11.  Plaintiff further alleges Director Cook, Mayor Tobin, Deputy Chief Sandy, and Attorney Van Donsel conspired to achieve this result.

But "[t]he validity of an arrest does not depend on an ultimate finding of guilt or innocence." Simpson, 159 F. Supp. 3d at 434.  And in this case, Ruggiero was arrested pursuant to a warrant issued by Judge Burns.  Soberanis v. City of N.Y., 244 F. Supp. 3d

---

[9]  Even mindful of the procedural posture, the warrant and accompanying court decision supplied as exhibits are suitable for judicial notice.  Dkt. No. 54-1.

395, 400 (S.D.N.Y. 2017) (dismissing false arrest claim because arrest warrant "vitiates any claim of false arrest"); Phillips v. DeAngelis, 571 F. Supp. 2d 347, 353 (N.D.N.Y. 2008) ("No cause of action for false arrest will lie where the arrest was effected pursuant to an arrest warrant.").

Even in the absence of a warrant, Ruggiero's factual allegations would be insufficient to demonstrate that Officer Myers acted *constitutionally* unreasonably in seeking plaintiff's arrest on the basis of Zoning Officer Rhea's alleged falsehood. Marom v. Town of Greenburgh, 722 F. App'x 32, 35 (2d Cir. 2018) (summary order) (explaining that arresting officers are not required to investigate exculpatory defenses offered by the person being arrested). Accordingly, plaintiff's § 1983 claim for false arrest will be dismissed.

### 2. **Malicious Prosecution**

Next, the City defendants argue Ruggiero's § 1983 malicious prosecution claim must be dismissed because Cortland City Court Judge Lawrence Knickerbocker initially denied plaintiff's motion to dismiss the criminal charge against him. According to defendants, the fact that ADA DeMarco later decided to exercise his prosecutorial discretion to voluntarily dismiss the charge does not indicate that the proceeding terminated "favorably" to plaintiff as required by the law governing this kind of claim. Plaintiff responds that the City defendants improperly decided to continue the prosecution after his arrest.

"To prevail on a claim of malicious prosecution, a plaintiff must establish: (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." Hulett, 253 F. Supp. 3d at 496. "In addition, a § 1983 malicious prosecution claim requires that 'there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth

Amendment.'" Id. (quoting Washington v. Cty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004)).

Just recently, the Second Circuit issued a decision clarifying a frequently litigated aspect of § 1983 malicious prosecution claims brought in New York federal courts: the favorable termination element. Lanning v. City of Glens Falls, –F.3d–, 2018 WL 5810258 (2d Cir. Nov. 7, 2018). In Lanning, the Second Circuit clarified that the prosecutor's failure to proceed to a trial on the merits of the charge or charges does not necessarily imply a lack of reasonable grounds for prosecution. Id. at *6 (affirming dismissal of malicious prosecution claim because the termination of charges in plaintiff's case was "consistent with dismissal on any number of procedural or jurisdictional grounds, all of which fail to affirmatively indicate innocence").

Upon review of Ruggiero's submissions in light of Lanning, he has failed to plausibly allege that the circumstances under which the charges were dismissed by the Court affirmatively indicated his innocence. Accordingly, plaintiff's § 1983 malicious prosecution claim must be dismissed.

### 3. **Denial of Medical Treatment**

The City defendants argue the § 1983 claim for denial of medical treatment must be dismissed because Ruggiero concedes in his complaint that he received medical treatment within "several hours" of his arraignment on July 11. Plaintiff responds that Officer Myers was deliberately indifferent to plaintiff's serious need for asthma and shingles medication during the time he was in the police car. As plaintiff explains, "another officer rushed" to help plaintiff when he "finally arriv[ed] to the station." Pl.'s City Opp'n at 16.

As an initial matter, Ruggiero correctly points out that it is the Fourteenth Amendment,

not the Eighth, that protects him under these circumstances.  See, e.g., V.W. v. Conway, 236 F. Supp. 3d 554, 582 (N.D.N.Y. 2017) (explaining that "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilty in accordance with due process of law").  A pre-trial detainee like plaintiff may assert a § 1983 deliberate indifference claim under the Fourteenth Amendment by satisfying a slightly modified version of the two-pronged test for an Eighth Amendment violation.  Hulett, 253 F. Supp. 3d at 489.

First, a plaintiff must allege a deprivation that is objectively "sufficiently serious"; that is, it must be a "condition of urgency, one that may produce death, degeneration, or extreme pain."  Simpson, 159 F. Supp. 3d at 443.  Second, a plaintiff must allege the defendant "knew, or should have known," that his conduct "posed an excessive risk to health or safety."  Hulett, 253 F. Supp. 3d at 489.  This formulation of the second prong is more lenient than the Eighth Amendment version, which requires a plaintiff to demonstrate the defendant "kn[ew] of and disregard[ed] an excessive risk to [ ] health and safety."  Id.

Ruggiero's deliberate indifference claim is a much closer call than his false arrest or malicious prosecution arguments, especially given plaintiff's status as a pro se litigant.  This is because the dangerous airway restriction caused by an asthma attack is a serious event that in rare cases can even prove fatal.  Gersbacher v. City of N.Y., 134 F. Supp. 3d 711, 724 (S.D.N.Y. 2015).  Importantly, however, just being asthmatic is not a serious medication condition of constitutional significance.  Id.

The distinction matters here.  Ruggiero does not allege he was undergoing an asthma attack at the time of his arrest.  Rather, plaintiff alleges that the hot temperatures in the back seat of the patrol car may have brought one on at some point during the trip to the police

station.  Pl.'s City Opp'n at 16.  However, as the City defendants point out, plaintiff alleges that he was only denied medication during the "roughly 5 minute car ride" to the station.  Am. Compl. ¶ 81.

Given the short duration of the trip to the police station, Ruggiero's request for assistance from the officer driving the patrol car (even in light of an allegation of a rapidly worsening situation in the back seat) does not give rise to a plausible § 1983 claim that would survive application of the doctrine of qualified immunity.  Gersbacher, 134 F. Supp. 3d at 724-25 (recognizing that a delay in treatment does not necessarily reflect deliberate indifference); cf. Davis v. McCready, 283 F. Supp. 3d 108, 120 (S.D.N.Y. 2017) ("In evaluating whether a delay in treatment is sufficiently serious, the actual medical consequences that flow from the alleged denial of care will be highly relevant.").  Accordingly, plaintiff's medical treatment claim will also be dismissed.[10]

### 4.  First Amendment Retaliation

The City defendants argue Ruggiero's retaliation claim must be dismissed because plaintiff was arrested pursuant to a warrant.  Plaintiff responds that, in addition to that arrest, he was "taken out of the ZBA meeting" when he was trying to speak.  Pl.'s City Opp'n at 17.

"The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment."  Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994).  "A plaintiff asserting a First Amendment retaliation claim must establish that:  (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this

---

[10]  Plaintiff further alleges that he was denied access to his pain medication for shingles until several hours after arraignment, but he does not identify the officer or officers responsible for that further deprivation.

adverse action and the protected speech." <u>Morris v. N.Y. State Police</u>, 268 F. Supp. 3d 342, 360-61 (N.D.N.Y. 2017).

The City defendants are correct that the current state of Second Circuit law precludes Ruggiero from arguing that his July 11 arrest (based on a warrant issued after his June 12 encounter with Zoning Officer Rhea) violates his First Amendment rights. <u>Galarza v. Monti</u>, 327 F. Supp. 3d 594, 603-04 & n.4 (S.D.N.Y. 2018) ("The existence of probable cause defeats a First Amendment claim premised on the allegation that defendants arrested a plaintiff based on a retaliatory motive."); <u>see also</u> <u>Higginbotham v. Sylvester</u>, –F. App'x–, 2018 WL 3559116, at *2 (2d Cir. July 25, 2018) (affirming dismissal of retaliatory arrest claim where plaintiff failed to demonstrate that his protected activity was "but-for" cause of arrest).

Ruggiero also asserts in his opposition submission that he was "taken out of the ZBA meeting" in retaliation for attempting to speak on the record. Pl.'s City Opp'n at 16-17. However, a review of plaintiff's operative pleading does not necessarily confirm when, how, or under what circumstances that took place. Plaintiff repeatedly asserts that he was removed from the ZBA's *agenda*, Am. Compl. ¶¶ 45-46, 60, 61, but it is unclear when and how (and if so, for what stated reason) plaintiff was ever actually removed from one or more ZBA meetings.

Ruggiero does go on to allege that on April 7, 2015, Mayor Tobin and Zoning Officer Rhea violated his "personal space" at a "public meeting" in front of approximately fifty people, language that suggests he may have been physically removed or otherwise escorted from that meeting at that time. Am. Compl. ¶ 76. Again, though, the facts as pleaded are insufficient to draw that conclusion, since a "violation of personal space" might also mean anything from an unwanted touching to an attempt to intimidate someone by, say, looming

over them or standing too close to them.

Most of these hypothetical examples are not constitutionally problematic. <u>Zherka v. Amicone</u>, 634 F.3d 642, 645-46 (2d Cir. 2011) (observing that First Amendment retaliation claims must be based on an "actual chill" in speech or a "concrete harm" such as "loss of business or other tangible injury"). However, certain kinds of disputes between private citizens and municipal officials can give rise to viable First Amendment claims. <u>See, e.g.</u>, <u>Gagliardi</u>, 18 F.3d at 195 (reversing dismissal of free speech claim where plaintiffs alleged municipal officials deliberately chose to stop enforcing local laws in direct response to plaintiffs' protected speech).

Ruggiero's First Amendment retaliation claim, as presently pleaded, will be dismissed. However, for reasons discussed at the end of this decision, plaintiff will be permitted an opportunity to replead this claim by providing more specific details about his interactions with City officials during and after ZBA meetings.

### 5. **Equal Protection**

The City defendants contend Ruggiero's Equal Protection claim must be dismissed because he has failed to plausibly allege differential treatment. Plaintiff responds that City officials have given certain landlords favorable treatment for years while treating him unfairly.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional provision is "essentially a direction that all persons similarly situated be treated alike." <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 439 (1985). "There are a number of common methods for pleading an equal protection claim." <u>Kisembo v. N.Y.S. Office of Children & Family Servs.</u>, 285 F. Supp. 3d 509, 523

(N.D.N.Y. 2018).

First, "[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race.'" <u>Floyd v. City of New York</u>, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013) (quoting <u>Brown v. City of Oneida</u>, 221 F.3d 329, 337 (2d Cir. 1999)). Second, "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." <u>Brown</u>, 221 F.3d at 337 (citing <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 373-74 (1886)). Third, "[a] plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." <u>Floyd</u>, 959 F. Supp. 2d at 570 (citation omitted).

With respect to these first three theories, a plaintiff "generally need not plead or show the disparate treatment of similarly situated individuals." <u>Pyke v. Cuomo</u>, 258 F.3d 107, 108-09 (2d Cir. 2001); <u>see also Doe</u>, 462 F. Supp. 2d at 546 (observing that courts have dispensed with the "similarly situated group" requirement in cases where the "differential treatment of the target group could otherwise be clearly demonstrated").

Ruggiero is not a member of an inherently suspect or vulnerable class and therefore these first three theories of relief are inapplicable to his claims. Instead, plaintiff explains that he is seeking relief as a "class of one" based on the doctrine of "selective enforcement," a statement that actually conflates two distinct kinds of additional Equal Protection claims. Pl.'s City Opp'n at 17.

For instance, pursuant to <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562 (2000), a plaintiff may assert a so-called "class of one" claim. <u>Doe</u>, 462 F. Supp. 2d at 558. Alternatively, pursuant to <u>Le Clair v. Saunders</u>, 627 F.2d 606 (2d Cir. 1980) a plaintiff may assert a "selective enforcement" claim. <u>Savino v. Town of Southeast</u>, 983 F. Supp. 2d

293, 301 (S.D.N.Y. 2013). "Both types of claims require a showing of similarly situated individuals or groups who were treated differently." Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011).[11] Importantly, however, so-called "class of one" claims require "a different, more demanding standard of similarity." Id. at 696-97.

Thus, to properly allege an Equal Protection violation under a "class of one" theory, "the plaintiff must allege that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate governmental policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of mistake." Panzella v. City of Newburgh, 231 F. Supp. 3d 1, 7 (S.D.N.Y. 2017) (quoting Fahs Constr. Grp., Inc. v. Gray, 724 F.3d 289, 292 (2d Cir. 2013)).

"In other words, 'a plaintiff asserting a 'class of one' equal protection claim must allege that the intentional disparate treatment alleged to state the first element of the claim was wholly arbitrary or irrational.'" Panzella, 231 F. Supp. 3d at 7 (quoting Vaher v. Town of Orangetown, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013)). "Plaintiffs proceeding under this theory 'must show an extremely high degree of similarity between themselves and the person to whom they compare themselves.'" Id. (quoting Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010)).

To plead a "selective enforcement" claim, a plaintiff must allege facts showing

---

[11] Courts appear to remain split on whether a less stringent standard should apply to selective enforcement claims. Panzella, 231 F. Supp. 3d at 6-8 (surveying the state of the law).

that: "(1) 'he, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the plaintiff.'" Panzella, 231 F. Supp. 3d at 7 (quoting Vaher, 916 F. Supp. 2d at 433)).

In a selective enforcement case, a plaintiff must show that "plaintiff and comparators were 'similarly situated in all material respects,' or that 'a prudent person, looking objectively at the incidents would think them roughly equivalent.'" Missere v. Gross, 826 F. Supp. 2d 542, 561 (S.D.N.Y. 2011); see also Bishop v. Best Buy, Co. Inc., 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) ("Well-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of such a claim.").

Ruggiero devotes a great deal of time chronicling his ongoing dispute with the City over Calabro's violations of the zoning laws, and a review of the parties' submissions suggest plaintiff may have also pursued various state law remedies against Calabro or the City (or possibly both) in an attempt to force more uniform compliance.

However, "[c]ourts, including the Second Circuit, have repeatedly cautioned about the danger of ordinary disputes between a citizen and a municipality—whether it be about land use, licenses, inspections, or some other regulatory or investigative function of local governments—being transformed into federal lawsuits" through an overly expansive reading of the Equal Protection clause. Avraham v. Lakeshore Yacht & Country Club, Inc., 2016 WL 6585589, at *14 (N.D.N.Y. Nov. 7, 2016).

So when a plaintiff seeks to pursue a *constitutional* claim for relief on the basis of such a violation or violations, our case law emphasizes a distinction of particular importance

here:  a citizen <u>actually suffering</u> less favorable treatment than similarly situated citizens is entitled to pursue a § 1983 claim while a citizen attempting to use a federal civil rights action to force municipal officials to stop permitting a fellow citizen to violate the zoning law is not.  <u>See, e.g.</u>, <u>Missere v. Gross</u>, 826 F. Supp. 2d 542, 564 (S.D.N.Y. 2011) ("[Plaintiff] cannot make out an Equal Protection claim, either on a selective enforcement or class-of-one theory, based *merely* on favorable treatment of another, because that does not establish that he also suffered any differential treatment.").

A close review of Ruggiero's submissions confirm that permitting him to pursue an Equal Protection claim based on his current factual allegations would stretch this distinction past its breaking point.  Plaintiff alleges that he first challenged Zoning Officer Rhea's decision not to require a certain variance at Calabro's Tompkins Street property in November of 2014.  Am. Compl. ¶ 54.  Plaintiff further alleges that although City officials attempted to prevent it, he was heard on that exact issue during the December 8, 2014 ZBA meeting.  <u>Id</u>. ¶¶ 55-57.  According to plaintiff, at that time the ZBA requested additional information and tabled his challenge to its next meeting on January 12, 2015.  <u>Id</u>.  In the meantime, plaintiff alleges that City officials ignored his request to convene an independent committee to review alleged violations of the law.  <u>Id</u>. ¶¶ 58-59.

Ruggiero then claims that he was briefly removed from, and then restored to, the ZBA's January 12 meeting agenda.  Am. Compl. ¶¶ 60.  Plaintiff's operative pleading confirms that he was heard further at that meeting, and that ZBA Member Funk actually refused Attorney Van Donsel's request to dismiss plaintiff's case for running afoul of the relevant statute of limitations.  <u>Id</u>. ¶ 62.  Plaintiff alleges the ZBA again tabled their deliberations and asked for more information from the City.  <u>Id</u>.

On February 9, 2015, the ZBA "made clear" that "no evidence exists" to establish that Calabro's Tompkins Street project did *not* need a variance. Am. Compl. ¶ 66. At this meeting, ZBA Member Place "admitted on the record" that ZBA members were aware of selective enforcement of the zoning regulations by unnamed City officials. Id. ¶ 67. ZBA Member Place also "admitted awareness" of "unequal tax assessments favoring connected landlords." Id.

In March of 2015, Zoning Officer Rhea told Ruggiero that he was taking some kind of action to solve Calabro's variance problem. Am. Compl. ¶¶ 68-69. Then, at the next ZBA meeting on March 9, ZBA Member Place "produced a Certificate of Compliance" for Calabro's property that ZBA Member Funk believed to be a forgery. Id. ¶ 71. In April, at a "videotaped public meeting held in City Hall," Mayor Tobin and Zoning Officer Rhea violated Ruggiero's "personal space" in front of approximately fifty people. Id. ¶ 76.

Later, when Ruggiero called Zoning Officer Rhea to discuss a new zoning violation at Calabro's Tompkins Street property, Zoning Officer Rhea requested the fateful in-person meeting that would later result in plaintiff's July 11 arrest. Am. Compl. ¶ 78. Finally, plaintiff alleges that at unspecified points in 2015 and 2016, City officials, including Zoning Officer Rhea and Director Knickerbocker, continued to unfairly enforce the zoning laws against plaintiff. Id. ¶¶ 102-107.

Even mindful of his pro se status, Ruggiero has failed to allege a plausible § 1983 Equal Protection claim. Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc., 192 F. Supp. 2d 143, 158 (S.D.N.Y. 2002) ("Failure to proceed against *others* who are comparably situated is not by itself a basis for finding a denial of equal protection."). And as before, without an underlying constitutional violation there can be no § 1983 liability against the City

itself.  <u>Segal</u>, 459 F.3d at 219.

Again though, for reasons discussed at the end of this decision, Ruggiero will be permitted an opportunity to replead an Equal Protection claim by providing more specific details about his specific interactions with specific City officials, and explaining in concrete detail how he himself might have been treated less favorably than one or more sufficiently similarly situated comparators.

### 6.  <u>New York State Constitution</u>

The eighth cause of action in Ruggiero's operative complaint asserts a claim for deprivation of rights under the New York State Constitution.  Am. Compl. ¶¶ 127-29.  Upon review, this claim will be dismissed.

"Under New York law, a state constitutional-tort claim will not lie when state tort law provides an alternative means of redress."  <u>Alwan v. City of N.Y.</u>, 311 F. Supp. 3d 570, 588 (E.D.N.Y. 2018).  Nearly all of the various federal claims identified by Ruggiero—including those for false arrest, malicious prosecution, and retaliation—have state law analogs that render a constitutional claim duplicative.  <u>Id</u>.

Equally important, "plaintiffs asserting claims for New York State constitutional torts must comply with the notice of claim provision," a requirement imposed by New York law and strictly construed.  <u>Pflaum v. Town of Stuyvesant</u>, 937 F. Supp. 2d 289, 303 (N.D.N.Y. 2013) (Suddaby, J.).  Ruggiero has not alleged that he filed a notice of claim, timely or otherwise, in support of this particular cause of action.  Accordingly, plaintiff's state constitutional claim must be dismissed.

### D.  <u>Leave to Amend</u>

As a final matter, Ruggiero has requested leave to amend his complaint in the event

the Court finds deficiencies in one or more of his claims. That request will be granted in part.

Generally speaking, "[a] pro se complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (citation omitted). However, if the problems with a complaint are "substantive" rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to re-plead would be "futile" and "should be denied." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000).

In this case, Ruggiero's filings suggest he may have a plausible First Amendment retaliation claim and/or Fourteenth Amendment Equal Protection claim against one or more of the City defendants. See, e.g., Graham v. Macy's, Inc., 2016 WL 354897 at *10 (S.D.N.Y. Jan. 28, 2016) (observing that pro se litigant had been permitted opportunity to amend, at least in part, because her motion papers contained new allegations that "begin to—although they do not fully—remedy the deficiencies in her Complaint"). Accordingly, he will be given leave to replead the factual circumstances surrounding those claims. However, amendment of plaintiff's other claims would be futile and therefore he will not be permitted to replead them.

Any amended pleading filed by Ruggiero must be a complete pleading. In other words, it will supersede and replace his prior pleading in all respects. Plaintiff is advised that he cannot incorporate by reference any portion of his prior filings. And although plaintiff may attach documents to his pleading if he wishes, he is advised that he should plead within the numbered paragraphs of the complaint itself each fact or facts upon which he seeks to pursue a claim. Plaintiff is further advised that, to the extent practicable, he should plead

with specificity the time, place, and description of each event or events on which he seeks to base a First Amendment or Equal Protection claim.  Finally, although plaintiff has named eighteen different City officials and an unspecified number of Does, he should take care to identify the specific actor or actors responsible for each alleged instance of misconduct and describe how they were each "personally involved" in the constitutional violation.

## V.  CONCLUSION

Ruggiero's conspiracy, false arrest, malicious prosecution, denial of medical treatment, and state law constitutional claims must be dismissed with prejudice.  However, plaintiff's retaliation and equal protection claims will be conditionally dismissed without prejudice to afford him an opportunity to replead.

Therefore, it is

ORDERED that

1.  The County defendants' motion to dismiss is GRANTED;

2.  The City defendants' motion to dismiss is GRANTED in part and DENIED in part;

3.  Plaintiff's claims against the County defendants are DISMISSED WITH PREJUDICE;

4.  The Clerk of the Court shall terminate the County defendants as parties to this action;

5.  Plaintiff's conspiracy, false arrest, malicious prosecution, denial of medical treatment, and state law constitutional claims against the City defendants are DISMISSED WITH PREJUDICE;

6.  Plaintiff's First Amendment retaliation and Fourteenth Amendment Equal Protection claims against the City defendants are DISMISSED WITHOUT PREJUDICE; and

7. Plaintiff may file an amended complaint as to the First Amendment retaliation and Fourteenth Amendment Equal Protection claims against the City defendants in accordance with the instructions set forth above within thirty (30) days from the date of this Memorandum–Decision & Order.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  November 14, 2018
       Utica, New York.